**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| INTERCONTINENTAL GREAT BRANDS, LLC; and MONDELĒZ CANADA, INC. | ) | No. 25-cv-04489 |
| Plaintiffs, | ) | |
| | ) | Judge Jeremy C. Daniel |
| v. | ) | |
| | ) | |
| GHOST, LLC; GHOST BEVERAGES, LLC; GHOST LIFESTYLE, LLC; and KEURIG DR. PEPPER, INC. | ) | |
| Defendants, | ) | |

**PLAINTIFFS' POST-HEARING BRIEF IN SUPPORT OF THEIR**
**MOTION FOR A PRELIMINARY INJUNCTION**

## I. Ghost's Breach of the License Agreement is Dispositive on the Question of Trademark Infringement.

As the Court recognized, the validity of the Marks at issue in this case and Defendants' use of those Marks in their products are not in question. Tr. 4. The question of trademark infringement here turns on whether Defendants have a contractual right to use Mondelēz's Marks after April 17, 2025, whether for purposes of selling off inventory or otherwise. If the Court finds that Mondelēz terminated the License Agreement ("Agreement" or "Agmt.") for breach on March 18, 2025 pursuant to Section 13(c) of the Agreement, the answer to that question is no: Defendants have no legal right to use the Marks and their doing so constitutes *prima facie* trademark infringement.

## II. The Unrebutted Evidence Shows That Mondelēz Properly Terminated the License Agreement for Breach on March 18, 2025.

The Agreement was clear and unambiguous. It required Ghost to obtain Mondelēz's approval before assigning its rights under the Agreement. Agmt. § 18(k) ("neither party *will assign* any of its rights or obligations under this Agreement *without* the other party's written approval …"). It specified what types of transactions constituted an "assignment" requiring such approval. *Id.* ("'Assign' includes all transfers of control, whether by stock or asset transfer or merger."). And it prescribed the procedure by which Ghost must request approval, should it have wanted to transfer its rights. *Id.* § 18(n) ("Requests for Approval").

The Agreement was equally clear and unambiguous with respect to Mondelēz's termination rights. As relevant here, Mondelēz could terminate for a breach of "any term of th[e] agreement" under Section 13(c), in which case the Agreement would end in 30 days and without a sell off period for Ghost. *Id.* §§ 13(c), 14(b). Or Mondelēz could terminate under Section 13(d) after a change in control for any reason. *Id.* § 13(d).

The unrebutted evidence introduced before and during the Hearing shows that Mondelēz properly terminated the Agreement for breach on March 18, 2025. Ms. Renny's testimony that

Ghost never sought Mondelēz's consent to assign its rights to KDP before March 18, 2025 is unrebutted. Tr. 31. Ms. Renny's testimony that Mondelēz never approved that assignment, before or after it occurred on December 31, 2024, is unrebutted. *Id*. Mondelēz notified Ghost of the breach in its January 29, 2025 letter where it expressly reserved all rights with respect to Ghost's breach of Section 18(k). Ujdur Decl. Ex. B. And Mondelēz notified Ghost that it was terminating the License because of that breach on March 18. *Id.* Ex. C.

Faced with this overwhelming evidentiary record, Defendants offer myriad reasons why they should not be held to the terms of the Agreement and the consequences of their own conduct. None of these arguments, most of which are new, should change the outcome here.

**A. Defendants Cannot Strike Section 18(k) From the License Agreement.**

Defendants first ask the Court to ignore Section 18(k) on the ground that Section 13(d) is more "specific," and only one provision in the Agreement can apply to the KDP deal. Opp. § I.A. Defendants are incorrect. Their proposed interpretation would have the Court ignore the plain meaning of Section 18(k), which by its terms applies to the KDP deal. *Romspen Mortg. Ltd. P'ship v. BGC Holdings*, 20 F.4th 359, 371 (7th Cir. 2021) (the court may not interpret a contract "in a way that is contrary to the plain and obvious meaning of the language used." (citation omitted)). Defendants' proposed interpretation would also violate the bedrock principle that "contracts are to be read so as to give meaning to every term and, conversely, to avoid any term being rendered superfluous." *Great W. Cas. Co. v. Nationwide Agribusiness Ins. Co.*, 711 F. Supp. 3d 939, 943 (N.D. Ill. 2024).[1]

---

[1] Defendants "general-specific" argument also fails because Section 18(k) specifically applies to changes of control, just like 13(d) does. *See* Agmt. § 18(k) ('[a]ssign' includes all transfers of control, whether by stock or asset transfer or merger"). Defendants' reliance on *H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 835–37 (7th Cir. 2012), is misplaced because the clause

In fact, Defendants' new interpretation of Section 18(k) runs contrary to their understanding in October 2024. Defendants testified that each knew about Section 18(k), its applicability to their deal, and its importance to Mondelēz. Tr. 16-18, 62-63, 70. That's why Mr. Lourenco (at KDP's behest) sought to revise Section 18(k) with a specific carveout that would permit KDP (among others) to assume Ghost's rights to the Marks *without* Mondelēz's consent—12 days before Defendants announced the KDP deal. *Id.* at 16, 70; Pls.' Ex. 1. Ms. Renny rejected that proposed change and told Mr. Lourenco Mondelēz would never agree. Tr. 18; Pls.' Ex. 1.[2]

**B. Mondelēz Did Not "Clearly Approve the Transaction in Writing"**

Despite Ms. Renny's testimony and the undisputed absence of evidence that Ghost sought or received Mondelēz's approval to assign its rights to KDP through the procedures prescribed by the Agreement, Defendants argue that Ms. Renny, on behalf of Mondelēz, "clearly approved the Transaction in writing, more than once." Opp. at 8. The apparent bases for these "clear approvals in writing" are telephone calls between Ms. Renny and Mr. Lourenco *before* Ms. Renny knew about any KDP deal; a text message and email concerning an extension of Ghost's license to use the Oreo brands, which Ms. Renny had been working on with Mr. Lourenco since January 2024, Tr. 21-24; a single mention of KDP in a 53-slide presentation *Ghost* made to Mondelēz seven days after the public announcement of the KDP deal; and a LinkedIn post from Ms. Renny's personal page congratulating KDP's CEO on the Ghost deal.

---

in that case did not expressly apply to changes of control, while Section 18(k) does. *Id.*

2 The Hearing revealed that Mr. Lourenco failed to advise KDP that Mondelēz expressly rejected his attempt to delete or revise the change of control provisions, which could explain Mr. Whitmore's testimony that he was led to believe that Mondelēz had indicated "it would be favorable on KDP's acquisition." Tr. 63-64. In any case, the testimony surrounding Plaintiffs' Exhibit 1 demonstrates that Ms. Renny never said there was "no way [Mondelēz] would consider exiting" the Ghost partnership because of a change in control, or that she said "Mondelēz would love to work with KDP," as Mr. Lourenco asserts in his Declaration. *See* Lourenco Decl. ¶¶ 12-13; Tr. 13.

Setting aside that Ghost could not plausibly have believed that Ms. Renny could transfer rights to billion-dollar brands through text messages or social media posts, the content of these "writings"—and the unrebutted testimony about them from Ms. Renny—demonstrate that *none* of these communications contain either a request for, or grant of, approval to transfer Mondelēz trademark rights from Ghost to KDP. *See, e.g.*, Tr. 21 (October 30 minutes contain no discussion of KDP deal), 21-24 (November 18 text message and January 14 email reference Oreo renewal). And other (nonwritten) conversations Defendants rely on appear to be not credible: such as Mr. Lourenco's statement that Ms. Renny knew he was meeting with potential buyers on October 17, 2024 and provided him the recent Amendment 7 to facilitate those conversations. *See* Tr. 35 (testifying that Mr. Lourenco never told her he was meeting with potential buyers on October 17 and that Mondelēz would never have agreed to exclusivity in Amendment 7 had she known).

**C. Defendants' Waiver and Estoppel Arguments Fail.**

Waiver does not apply because Defendants must show that Mondelēz's conduct was "wholly inconsistent with" enforcing its right. *Jokich v. Rush Univ. Med. Ctr.*, 42 F.4th 626, 636–37 (7th Cir. 2022). Mondelēz's conduct was not only "consistent" with enforcing Section 18(k), but *Mondelēz did enforce Section 18(k) when it rejected Lourenco's attempt to strike it from the Agreement*. Nor did Mondelēz waive any contractual rights when Messrs. Parnell and Call engaged in negotiations with KDP in the months following the breach. Had a new deal been consummated as a result of their negotiations, it would have contained written approval of the licensing assignment to KDP.[3]

[3] The Agreement also contains a nonwaiver clause, Agmt § 18(b), which Illinois courts enforce absent "clear and convincing" evidence of waiver, which there is not here. See Dkt. No. 18 at 8 n.1 (collecting cases concerning nonwaiver clause).

Defendants' equitable estoppel argument also fails because it rests on the same misplaced premise that Mondelēz misled Ghost. The evidence shows that Mondelēz engaged with Ghost in the ordinary course of an existing licensing relationship during pendency of the KDP transaction, and that Mondelēz received little information from Ghost, and no information from KDP, about the status of the KDP transaction even after it had closed. Tr. 23-24 (testifying Mondelēz first learned mid-January that the KDP transaction closed). Defendants were not misled.

Nor can Defendants claim Mondelēz was estopped from invoking termination under Section 13(c) by first invoking Section 13(d). Mondelēz *told* Ghost in its first termination letter that it was reserving all rights with respect to a breach of Section 18(k). *See First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1012–13 (7th Cir. 1985) (party not be estopped from relying on breach to terminate even where not initially invoked).

**III. Mondelēz Did Not Breach "First" By Withholding Consent.**

Defendants argue "[i]f Ghost breached the Agreement, Mondelēz breached first" by unreasonably withholding consent when it refused Ghost's March 28, 2025 request for approval. Opp. at 10-11. Obviously, this cannot be true. Defendants admit that Mondelēz's supposed "breach" happened on March 28, approximately three months *after* Ghost breached on December 31, 2024. Mondelēz did not "breach first." Nor does Mondelēz's refusal to consent to Ghost's belated request constitute a breach. *See, e.g.*, *Quality Oil, Inc. v. Kelley Partners*, Inc., 657 F.3d 609, 615 (7th Cir. 2011) ("[c]onsent never sought cannot be unreasonably withheld"). And withholding approval would have been "reasonable" given Mondelēz's concerns "about the way that KDP valued our licensing relationship." Tr. 26 (Renny stating that Lourenco told her KDP "did not value licensing" and that he was surprised by "how little KDP valued the Mondelēz

brand"); *IGT v. High 5 Games, LLC*, 380 F. Supp. 3d 390, 400 (S.D.N.Y. 2019) (withholding approval in licensing context requires only an objective, reasonable basis).[4]

## IV. The Law Requires the Court to Presume Irreparable Harm and Defendants Have Put Forward No Evidence to Rebut That Presumption.

Under the Lanham Act and established Seventh Circuit law, Mondelēz is entitled to a presumption that it will suffer irreparable harm from Defendants' unlawful use of its trademarks. 15 U.S.C. § 1116(a); *see, e.g.*, *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992). That presumption exists because it is "virtually impossible to ascertain the precise economic consequences of [the] intangible harms" inherent to trademark infringement. *Abbott Lab'ys*, 971 F.2d at 16. In fact, the risk of harm is heightened here because an ex-licensee is continuing to use Mondelēz's Marks after termination of the license, in which case "[t]he likelihood of confusion exists as a matter of law." *Bunn-O-Matic Corp.* v. *Bunn Coffee Serv., Inc.*, 88 F. Supp. 2d 914, 922 (C.D. Ill. 2000) (citations omitted).[5]

Defendants must rebut the presumption by producing *evidence* that consumers would not be confused, and that irreparable harm was unlikely. Defendants produced no such evidence at the Hearing. And the arguments in their Opposition, while not evidence, lack merit.

*First*, Defendants claim that Mondelēz's "delay" in seeking injunctive relief demonstrates the absence of irreparable harm. Opp. at 11-12. There was no delay: Mondelēz filed for injunctive relief eight business days after the infringement began, which is far more diligent than courts

---

[4] In fact, the one case Ghost cites suggests only a breaching party cannot recover *damages* if it fails to perform. Opp. at 11. The question of infringement at issue here depends only on whether Mondelēz properly terminated pursuant to Section 13(c), which Mondelēz has the unilateral right to do upon Ghost's breach, separate and apart from any recovery of damages on a later contract claim.

[5] Mondelēz cited numerous cases in its opening motion concerning the heightened presumption of irreparable harm when the infringer is a holdover licensee. *See* Mem. at 9-10 & 10 n.2.

require to show irreparable harm. *See* Dkt. No. 27 at 1-3 (collecting case law). Defendants' second Opposition cites two cases for the (irrelevant) proposition that months' long delay undermines irreparable harm. One of those cases (*Shaffer*) concerns a two-month delay in appealing a class certification denial of a § 1985 claim, not a trademark claim. And the other (*MB*) concerned a nine-month delay, not a two-month delay as Defendants claim. Opp. at 12.[6]

*Second*, Defendants argue that Mondelēz cannot be harmed because it continued to work with Ghost to develop new products, while Ghost was a licensee, and before Mondelēz knew the KDP deal would close. Opp. at 12. This argument makes no sense. Mondelēz had no reason to fear harm from confusion when Ghost was authorized to use its brands; the purpose of the enterprise was to use Mondelēz's brands to promote these products. The harm arose only after Ghost continued selling without a license, "falsely suggesting affiliation with the trademark owner" to consumers. *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983) (cleaned up). Under Defendants' logic, no holdover licensee could ever be enjoined if the licensor worked with the licensee without "real concerns about harm" during the term of the license. Opp. at 12.

*Third*, Defendants argue that their infringement is harmless because the remaining inventory "was manufactured before April 17 and according to the standards set out in the Agreement, making it lawfully manufactured." That argument would render Section 13(c) of the Agreement meaningless, because a breaching party could never be enjoined from selling off goods "lawfully manufactured" under the license. It also ignores the harm here, which is the false

---

6 *See MB Fin. Bank, N.A.* v. *MB Real Est. Servs., LLC*, 2003 WL 22765022, at *8 (N.D. Ill. Nov. 21, 2003) (rejecting irreparable harm where plaintiff knew of infringement in 2001 but waited until October 2002 to seek preliminary injunction). At any rate, even if Mondelēz had delayed, its decision to discuss a resolution before initiating litigation should not be punished. *See, e.g.*, *Ty, Inc. v. Publications Int'l, Ltd.*, 81 F. Supp. 2d 899, 903–04 (N.D. Ill. 2000) ("[A] good explanation for the delay [in seeking] injunctive relief … is that settlement discussions were ongoing.").

suggestion of affiliation with Mondelēz at the time Defendants are selling off the goods. And it runs contrary to well-reasoned case law considering and rejecting the same argument. In *Flawless Style LLC v. Saadia Group LLC*, for example, a district court found that selling off merchandise "approved by the [Licensor]" constituted irreparable harm because the "mere possibility" of damage to the plaintiff's reputation and goodwill warranted a preliminary injunction. 2023 WL 3687782, at *5–6 (S.D.N.Y. May 26, 2023) (cleaned up); *see also Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 381–83 (S.D.N.Y. 2000) (finding irreparable harm *even if* there is no evidence that "the products [are] inferior or altered in some way" and "*regardless of when the goods were manufactured*") (emphasis added).[7]

**V. The Equities Favors Mondelēz; Defendants' Alleged Hardships Are Self-Inflicted.**

The balance of equities favors Mondelēz, not Defendants. Mondelēz will suffer harm that is irreparable as a matter of law. *See supra* § IV. Whereas Mr. Lourenco claims that an injunction enforcing a contractual provision he negotiated and ignored, and which bars Defendants from selling off inventory following Ghost's breach, would cost Ghost millions of dollars. Lourenco Decl. ¶ 46. But "the law does not protect" the hardship arising from "the loss of the chance" to sell infringing products. *Flawless*, 2023 WL 3687782, at *6 (cleaned up). And if Defendants are ultimately right on the merits, their harm is addressable through damages.[8]

[7] Damage to Mondelēz's reputation is more than a "mere possibility" here. Mondelēz recently learned that, since termination, KDP lowered the quality of Ghost beverage cans bearing the Mondelēz marks—which has "outraged" consumers and damaged Mondelēz's brands. Tr. 29-31. Defendants now have an incentive to deprioritize the Mondelēz products, such that the can issue could merely be the tip of the iceberg. Such harm would be irreparable and is precisely the purpose of Mondelēz's right to swift termination in Section 13(c).

[8] Mr. Lourenco's testimony overstates the logistical hurdles to retrieving inventory already with Ghost's partners. *Id.* ¶ 50. KDP is a Fortune 500 company that has conducted numerous recalls in the past several years, such that it must have a process in place to recover its products. *See, e.g.*, *FDA Enforcement Report*, https://www.accessdata.fda.gov/scripts/ires/?Event=91651 (2023 recall of

Defendants rest their equities argument almost entirely on a single case, *Little Tikes Co.* v. *Kid Station Toys*, 2008 WL 1805379 (N.D. Ill. Apr. 18, 2008) that predates the Trademark Modernization Act, involves a weaker merits claim, and stands as an outlier to other cases holding that infringing ex-licensees have no right to sell off product after they breach a license agreement. *See supra* § IV. Unlike this case, however, in *Little Tikes* the licensee's conduct after the breach did not create the undue hardship.

Here, *all* of Defendants' purported "harms" are the result of their deliberate decisions to ignore Section 18(k) and continue manufacturing product for *months* after they knowingly breached the Agreement. For example: (1) Defendants testified they knew about the change in control approval provision and its importance to Mondelēz before signing their deal, but they decided to ignore it after Mondelēz refused to remove it; (2) Mondelēz notified Ghost of its breach and its reservation of rights on January 29, but Ghost did not dispute its breach and kept manufacturing product; and (3) after Mondelēz terminated for breach on March 18, Ghost did not dispute the breach for 10 days, and continued manufacturing product for another month, because Mr. Lourenco did not believe Ghost had breached the Agreement. Tr. 71-72 ("understood . . . what was being claimed" but continued manufacturing because he "didn't belie[ve] we breached"). Defendants knowingly proceeded at their own peril.

This dispute does not concern "a technical oversight," that would warrant sparing Defendants from their willful conduct for equitable reasons. Opp. at 1. The approval provision is not a technicality; it is a critical tool for protecting Mondelēz's brands. Nor was there any "oversight." Ghost and KDP knew about the approval provision and charged forward anyway.

---

Mandarin Orange Spice Herbal Tea K-Cups). Regardless, Ghost should be enjoined from selling off the "on hand" inventory it built up after its breach. Lourenco Decl. ¶ 49.

Now Defendants seek to skirt the termination provisions they agreed to, and sell off inventory they created after they willfully breached the Agreement. Such an outcome would be inequitable. The Court should grant Mondelēz's motion for an injunction and hold Defendants to the terms of the Agreement. *See Davis v. G.N. Mortg. Corp*., 396 F.3d 869, 881 (7th Cir. 2005) (citation omitted) ("courts are not in the business of rewriting contracts to appease a disgruntled party unhappy with the bargain it struck").[9]

**VI. Any Bond Should Be Minimal.**

Defendants argue Mondelēz should have to post a $27 million bond if the Court grants injunctive relief. That figure is speculative and unreasonable. Courts have declined to require a bond, or have required only a *de minimis* bond, where the harm to the enjoined party is of its own making. *See, e.g.*, *Am. Airlines, Inc. v. A 1-800-A-M-E-R-I-C-A-N Corp.*, 622 F. Supp. 673, 683, 686–87 (N.D. Ill. 1985) (de minimis $10,000 bond appropriate in trademark case where asserted harms from injunction were "created by [Defendant's] proceeding at its own peril with full knowledge of [Plaintiff's] claims and rights"). The Court should do the same here and award a *de minimis* bond of not more than $100,000, if any.

**<u>CONCLUSION</u>**

The Court should grant Plaintiffs' Motion for a Preliminary Injunction.

---

[9] The public interest also favors an injunction because the public has a strong interest in enforcing trademark law by enjoining infringers. *Abbott Lab'ys*, 971 F.2d at 19.

Dated: May 8, 2025

Respectfully submitted,

INTERCONTINENTAL GREAT BRANDS, LLC and MONDELĒZ CANADA, INC.

/s/ *Dean N. Panos*

Dean N. Panos
Thomas E. Quinn
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: (312) 222-9350

Lawrence W. McMahon
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Telephone: (202) 639-6000

*Attorneys for Intercontinental Great Brands, LLC and Mondelēz Canada, Inc.*